## SUTTON v. SUTTON.

1. Where a judgment creditor agreed to compromise his judgment, and then assigned it to one who made the payment of such compromise, the assignee cannot claim a greater amount from the judgment debtor.

2. Where a son advances money to pay off an outstanding judgment against his father at the request of the latter and with the creditor's consent, he becomes equitable assignee of the judgment to the extent of his payment. In this case there was an agreement that there should be an assignment.

3. When a tenant in common is entitled to reimbursement for improvements, stated. Where such a tenant makes improvements which add to the value of the common property, and at the same time is chargeable with rents and profits, the latter should be credited *pro tanto* with the increased value due to the improvements.

Before KERSHAW, J., York, November, 1885.

The opinion states the case.

*Mr. C. E. Spencer*, for appellant.

*Mr. G. W. S. Hart*, contra.

November 29, 1886. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This was a proceeding to partition real estate among the heirs of Jane Sutton under the following circumstances, as well as we can gather them from the argument and "Brief" in manuscript. It seems that originally the land belonged to Jonathan L. Sutton and his mother, Mary, as tenants in common. On March 8, 1867, a judgment was entered against both Jonathan L. and his mother, Mary, by one Youngblood, as executor of Gillespie, for $978.34, besides interest and costs. This judgment, of course, was a lien upon the whole land, the interest of Jonathan L. as well as that of his mother. In 1872 Mary, the mother, died, leaving her interest by will to Jonathan L., who thereby became sole owner. He made efforts to have the judgment "scaled," but on December 2, 1873, he was declared a bankrupt, and his assignee in bankruptcy conveyed his interest to Erwin & Steele, lien creditors, who thereupon gave their bond to Jonathan L. to execute titles to him, upon the payment of the purchase price agreed upon. In 1876 Jonathan L. died, without having paid the stipulated amount to Erwin & Steele; and in 1878 they sold the land to pay their claim. At that sale the land was bid off by Jane Sutton, the widow of Jonathan L., but

titles were made to J. F. Wallace as security for an advance made by him (as we suppose, to Erwin & Steele).

On February 14, 1874, after Jonathan L. Sutton became a bankrupt, but before his death, the distributees of Gillespie, the owners of the Youngblood judgment, through their attorney in fact, one Garrison, agreed to compromise the judgment for $800, which was considerably less than its face value, and on that day they gave two receipts, one to Jonathan L. Sutton for $100, and the other to William E. Sutton for $60, which also acknowledged that he (W. E. Sutton) had paid previously $400, making in the aggregate $560 paid on the compromise, and leaving unpaid $240. William E. Sutton paid $460. He was not the defendant in execution, and really it does not appear who he was, except that he was spoken of as having an interest in the land "to the extent of one-seventh," and we suppose he was a son of Jane. The judge found as a matter of fact, that this money was paid by W. E. Sutton at the instance of the bankrupt debtor, and no credits were placed on the execution, but loose receipts given.

In 1877 the balance due on the compromise of the Youngblood judgment had grown to $326.50, and both the defendants in execution, Jonathan L. and Mary, being dead, Garrison was about to levy on the land for the balance, when William E. Sutton again appeared and made an arrangement with one B. T. Wheeler, by which he (Wheeler) paid $326.50, the remainder of the compromise, taking from the judgment creditor a general assignment of the execution, and making an agreement in writing with the said William E. Sutton, that as soon as he (Sutton) refunded to him (Wheeler) the money advanced by him, with the stipulated interest, &c., he (Wheeler) would assign the execution to him. The money was never all actually paid, but William E. Sutton paid $100 in March, 1883. Wheeler was made a party, and he set up the judgment to recover the balance due him, and William E. Sutton, one of the heirs, claimed to be the owner of the whole judgment, subject to the rights of Wheeler, and reduced only by the amounts actually paid by J. L. Sutton, $100; and he also claimed that as the land was sold, he should be paid $700, the amount added to the value of the land by improvements made by him while he was in possession of the land.

The issues were referred to W. B. McCaw, Esq., as special referee, who substantially denied the claims of W. E. Sutton, and, on the contrary, charged him with $665.75 as rents; holding that, although he paid out of his own money $460, for which the first receipt was given, it was done voluntarily without the request of the debtor, and without an assignment or promise of an assignment *pro tanto* of the execution, and the same was to that extent satisfied. And as to the alleged betterments to the land, that, although his improvements had added to the value of the land $700, he was not entitled by law to be paid therefor by his co-tenants. The cause came up on exceptions before Judge Kershaw, who confirmed the report, except in two particulars: first, he found, overruling the referee in that respect, that the $460 were paid by William E. Sutton on the compromise, "at the instance and request of J. L. Sutton, the defendant in execution"; and, second, reducing the amount for which William E. Sutton should be charged with rent from $661.75 to $496.31.

From this decree William E. Sutton appeals upon the following grounds:

I. "For error of fact in not finding that the payment of $460 by William E. Sutton upon the Youngblood judgment was made in pursuance of an understanding and agreement between him and J. L. Sutton, the judgment debtor, that the same should stand open as a security for the return of said money and interest.

II. "For error of law in not holding that said payments made by William E. Sutton operated as a purchase of said judgment to himself as security as aforesaid, in view of the fact found in said decree, that they were made 'at the special instance and request of the judgment debtor.'

III. "For error of law in not adjudging that, at the time of the assignment of the judgment to B. T. Wheeler (procured to be made by the said William E. Sutton after the death of the judgment debtor), there remained due thereon at least the sum of $649, which should go to him after satisfaction made to said Wheeler.

IV. "For error of law in not holding that William E. Sutton is at least a creditor of the judgment debtor to the amount of his payments and interest thereon; and that he should be reimbursed before the payment of any sum to the heirs at law.

V. "For error of law in holding that in the event of a sale of the premises, the said William E. Sutton is not entitled to the value of his improvements (found by the referee to be $700), out of the proceeds of sale, before distribution among the heirs," &c.

The exceptions 1, 2, 3, and 4 make the point that William E. Sutton, having an interest in the land as one of the heirs, having paid $460 in order to make certain of the compromise, and Wheeler having agreed with him that the judgment should be assigned to him as soon as the advance by Wheeler was refunded, is in equity the owner of that judgment, and entitled to set it up as unpaid, except as to $100 paid by Jonathan L., the debtor. There can be no doubt that the referee and Circuit Judge were right in holding that the judgment is unpaid to the extent of the Wheeler balance, and stands to secure that advance, for it was actually assigned for that purpose. But the agreement was that it should secure that advance first and then be assigned to William E. Sutton, and the question arises as to what extent the said Sutton should be allowed to set up the judgment as still unsatisfied. The judgment on its face has no credits, but still stands open for the whole amount. We do not, however, think that either Wheeler or William E. Sutton should be permitted to set it up for more than $800. The original creditor agreed to reduce it to that amount, and received it. He then assigned it in general terms, but that assignment could not convey any higher interest than he had, which was already reduced to $800; and now to allow William E. Sutton to set it up for the whole amount not actually paid, would be to undo the compromise, or rather allow him to get the benefit of it, and in doing so to perpetrate a fraud not only on the original creditor, but upon the other heirs, his brothers and sisters.

But why may not William E. Sutton set up the judgment to secure the money actually advanced by him, to "make assurance doubly sure" as to the compromise? It strikes us that he has a strong equity to do so; that the circumstances make a case for the application of the doctrine of equitable assignment. It is true that William E. Sutton was not a defendant in execution, and, as such, bound to pay it; but he was in no proper sense a mere stranger, making a voluntary payment without the consent

of the judgment debtor or creditor. On the contrary, even before the death of his father and mother, he had a prospective interest in the land liable to levy and sale under the judgment, and he made the advances with the consent of the judgment creditor (see receipt), and at the instance and request of the judgment debtor, his ancestor. As Mr. Pomeroy says: "Under some circumstances, the payment of the amount due on a mortgage [and] judgment, when made by certain classes of persons, is held in equity to operate as an assignment of the mortgage. By means of the payment, the mortgage is not satisfied and the lien destroyed; but equity regards the person making the payment as thereby becoming the owner of the mortgage, at least for some definite purposes, and the mortgage as being kept alive, and the lien preserved for his benefit and security. This equitable result follows, although no actual assignment, written or verbal, accompanied the payment, and the securities themselves were not delivered over to the person making payment, &c. This equitable doctrine, which is a particular application of the broad principle of subrogation, is enforced whenever the person making the payment stands in such relation to the premises or to the other parties, that his interests, recognized either by law or equity, can only be fully protected and maintained by regarding the transaction as an assignment to him, &c. This doctrine is not admitted in favor of every person who pays off a mortgage. * * * The payment must be made by or on behalf of a person who had some interest in the premises, or some claim against other parties, which he is entitled in equity to have protected. A mere stranger, therefore, who pays off a mortgage as a purely voluntary act, can never be an equitable assignee. In general, where any person having a subsequent interest in the premises, and who is, therefore, entitled to redeem for the purpose of protecting such interest, and who is not the principal debtor primarily liable for the mortgage debt, pays off the mortgage, he thereby becomes an equitable assignee thereof, and may keep alive and enforce the lien so far as may be necessary in equity for his own benefit; he is subrogated to the rights of the mortgagee to the extent necessary for his own equitable protection." See 3 *Pom. Eq. Jur.*, §§ 1211, 1212, and authorities in notes.

Besides, when the money was paid with the consent of both the debtor and creditor, it seems to us a reasonable inference, and we so conclude, that there was an understanding between the debtor, Jonathan L., and William E., that as soon as the whole compromise was paid the judgment should be assigned to William E. to secure the advances made by him, the assignment not being made at the time for the reason that the creditor kept it to enforce the last payment on the compromise. This view is strengthened by the facts that the advances were not credited on the execution, and Wheeler agreed that when all the compromise was paid, the judgment should be assigned to William E., for the purpose, as we suppose, of securing the advances by him, whether made before or after the death of his ancestor; which advances insured the compromise and enured to the benefit of the heirs, including himself. In this there can be no injustice to the other heirs, for the compromise did not reduce the judgment below $800; and that, less the $100 paid by the defendant in execution himself, is all that the land is made liable for. See *Carson* v. *Richardson*, 3 *McCord*, 528.

Exception 5 complains of error in holding that in the event of a sale of the property, William E. Sutton is not entitled to the value of the improvements put upon the land by him, although he is charged with rents and profits. It appears by a number of cases, that in this State it is established as a rule that a tenant in common, who, of his own head, improves the common property, is not entitled individually to compensation therefor. This seems to be mainly on the ground that he could at any time have partition, and it is his own folly to improve the lands of others, who may dislike the improvements, or object, as some judge has expressed it, to be "improved out of their estates." *Thurston* v. *Dickinson*, 2 *Rich. Eq.*, 317; *Dellet* v. *Whitner*, *Cheves Eq.*, 223; *Hancock* v. *Day*, *McMull. Eq.*, 69; *Thompson* v. *Bostick*, *Id.*, 79; *Corbett* v. *Laurens*, 5 *Rich. Eq.*, 314. But it is certainly unjust that one shall be enriched at the expense and to the injury of another, and there are several well established exceptions to the rule. As we understand, it does not apply where the co-tenants consent to the improvements, or if they are necessary for the use and enjoyment of all the co-tenants (*Buck* v. *Martin*,

21 *S. C.*, 592), or notably when the improvements are made *bona fide* under an honest conviction of exclusive ownership of the land. *Scaife* v. *Thomson*, 15 *S. C.*, 369. In the latter case, the exception is nothing more than a particular application of the broad principle of "betterments" recognized by our law.

It is not claimed that this case falls under any of the exceptions above indicated, but it seems to us when one of the co-tenants made improvements which add to the value of the common property, and at the same time is chargeable with rents and profits, that it would be equitable to regard the rents and profits as paid and discharged *pro tanto* by the increased value which may have been imparted to the premises by the improvements. Judge Story, in his Equity Jurisprudence (see section 656*b*), says: "If improvements have been made by one tenant, a suitable compensation will be allowed him upon partition, or the property on which the improvements have been made shall be assigned to him," &c. Our courts have enforced the doctrine that, in making partition, the improved part shall, if practicable, be assigned to the improving tenant; and we cannot see why the same equity should not be enforced when there is no actual partition, but the land is sold for division of the proceeds. There may possibly be danger in allowing it to the full extent in every case, for the reason that the improvements may not be desired by the other co-tenants, who should not, against their consent, be "improved out of their estates." But there can be no danger of that, when the improving tenant is limited to the amount with which he may be chargeable with rents and profits for the common property. In such case he merely discharges the rents and profits, by the increased value *pro tanto*, which his improvements have added to the common property.

The judgment of this court is, that the judgment of the Circuit Court be modified so as to conform to the conclusions herein announced, and in all other respects be affirmed.