### 10507

### CAGLE *ET AL.* v. SCHAEFER *ET AL.*

#### (104 S. E. 321).

1. INFANTS—GUARDIAN AD. LITEM SHOULD DO MORE THAN FILE A FORMAL ANSWER.—A guardian *ad litem* is bound to look after the infant's interest and to act for him in all matters relating to the suit as the infant might act if of capacity; and the mere filing of a formal answer submitting the infant's rights to the protection of the Court, is not a sufficient compliance with the guardian's duty.

2. REMAINDERS — FOR PROTECTION OF ESTATE COURT OF EQUITY MAY ORDER SALE OF LAND.—Where Court of equity has before it all the parties in interest who are *in esse,* it may for protection of an estate order the sale of lands which are subject to remainders, etc., and a

possible trust, but. the power cannot be exercised save in case of a reasonable necessity.

3. REMAINDERS — DISCRETION OF COURT IN SELLING ESTATE .MUST BE EXERCISED ACCORDING TO ESTABLISHED RULE.—A Court of equity, in directing the sale of lands which are subject to future interests and remainders, cannot exercise its discretion in an arbitrary or capricious manner, but is governed by the established rules and principles of equity.

4. REMAINDERS — SALE OF LAND SUBJECT TO REMAINDERS NOT WARRANTED.—Where a testator devised lands to his son for life, with remainders over to the issue of the son, providing that in default of issue the land should be subjected to a trust, a Court of equity should not order a sale of lands at the instance of the son, who had considerably improved them, where there was no showing that sale was necessary for benefit of the estate or any of the beneficiaries.

5. REMAINDERS—SALE OF LAND SUBJECT TO, IMPROPERLY AUTHORIZED.— Where a life tenant improved lands, and it further appeared that the lands themselves were constantly enhancing in value, a sale should not be ordered at the instance of the life tenant, .who desired reimbursement for improvements, on the theory that the sale was necessary to protect the estate, because he was under no duty to insure the buildings; it in no wise appearing that the interests of the remaindermen were in jeopardy.

6. CONVERSION—THAT TESTATOR PUT VALUE ON LANDS DEVISED .TO SON FOR LIFE DID NOT WORK EQUITABLE CONVERSION.—Where a testator placed a value on lands devised to his son for life, with remainders over, etc., the`placing of such value, which was for the purpose of adjusting advancements, etc., did not amount to an equitable conversion which would warrant a Court in authorizing the son to. sell the lands. .

7. LIFE ESTATE—LIFE TENANT NOT ENTITLED TO REIMBURSEMENT FOR IMPROVEMENTS.—Ordinarily a life tenant cannot charge the estate of the remaindermen with the cost of his improvements, so where a testator, who had placed his son in possession of lands, devised them to him for life, remainders to his issue, .with a trust provision in default, the son, who had made improvements during the life of the testator and additional improvements thereafter, cannot charge the estates in remainder with the cost of such improvements, although those interested in the trust consented and the son as yet had no children; the possibility of issue not being extinct, and it not appearing that he made the improvements in reliance upon any misapprehension as to the intention of the testator.

8. LIFE ESTATE—LIFE TENANT CAN ONLY RECOVER AMOUNT IMPROVEMENT ADDED TO PROPERTY.—A life·tenant cannot recover the amount

of cost of improvements, even though he comes within an exception which allows him to recover for improvements, but is limited to recovering the amount which the improvements added to the actual and permanent value of the land.

Before SHIPP, J., Greenville, February, 1920.    Reversed.

Action by Alex. Cagle and Lillie O. Cagle against G. H. Schaefer *et al.* for specific performance.    From judgment for plaintiff against the defendant, Schaefer, said defendant appeals.

*Mr. W. M. Walters* for appellant.    No citations.

*Mr. J. J. McSwain,* for plaintiffs-respondents.

October 11, 1920.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

This is an action for specific performance of a contract between plaintiff, Alex. Cagle, and defendant, Schaefer, for the sale of 18 2-5 acres of land, part of a larger tract of 263 acres, known as the Parkins place, which was devised to plaintiff by his father for life, remainder over.    Defendant refused to comply, on the ground that plaintiff could not convey a good title in fee, according to the contract.    The Court decreed specific performance, and defendant appealed.

J. W. Cagle had three sons, Alex., Wilkins, and Osborne, all of whom were married.    Neither Alex. nor Wilkins had any children, though each had been married six or eight years before their father's death.    Osborne had five chil-- dren.    The father died about 1912, leaving of force his will, wherein (paragraph 3) he directed his executors to divide the residue of his personal estate (after paying his debts and legacies) into three equal parts, and give one part

to Alex., one to Wilkins, and one to J. W. Cox, as trustee for the children then or thereafter born to Osborne. He directed also that in making the division the share of Alex. should be charged with $4,877, advanced to him, and $13,150, the value of the Parkins place. There were similar directions as to advancements made to the other sons.

In paragraph 5, he devised the Parkins place to Alex. "for and during the term of his natural life, and at his death to his widow for life, and at her death to his children absolutely *per stirpes.* In default of such children, the same shall vest in my executors to be disposed of as provided in paragraph six."

In paragraph 6, he devised a block of stores to his executors, as trustees, to hold and manage, until the youngest child of his sons (naming them) shall come of age, and until the death of his sons, and to distribute the net income annually according to the plan directed in paragraph 3 during the lives of his sons; and should either Alex. or Wilkins die, leaving a wife, or wife and child or children, the widow for life, and the child or children, in remainder, to represent the son so dying in the distribution, until the period above limited is reached; and, should either die leaving neither wife nor child, the income is to be divided between the surviving son and the children of Osborne until said period is reached; and, upon the death of the last survivor of his sons to sell the property and divide the proceeds among their children *per stirpes.*

In paragraph 9, he says:

"My son, Alexander, may sell or exchange the Parkins place, provided the proceeds be invested in other real estate with the same limitations, or the property received in exchange be conveyed in like manner."

In 1917 Alex. brought an action against Wilkins, Osborne, and the children of Osborne, who are infants, their trustee, the executors, and some others, who had acquired liens on the interest of Alex. to obtain a decree for the sale of the

Parkins place. He alleged that his father put him in possession of the place six or seven years before his death with the understanding or agreement that it would be devised to him as a part of his share of the estate of his father, who was very wealthy; that the land was poor and run down, and the buildings much in need of repair; that, relying upon said understanding or agreement, he spent much time and money in repairing the buildings and improving the land, which was valued to him in the will at $13,150; that since the death of his father he had spent $40,000 in improving the property, so that it is now worth $60,000; that he desires to sell the place and invest $13,150, as that part of the proceeds subject to the limitations of the will; that his wife, his brother, and all parties in interest are willing that he be allowed to do so, and, therefore, he prayed for judgment that he be allowed to do so, and that the proceeds of sale in excess of $13,150 be adjudged to belong to him absolutely. The guardian *ad litem* of the infant defendants, children of Osborne, filed a formal answer, submitting their rights to the protection of the Court, and neither he nor their testamentary trustee took any further step in the proceeding to protect their interests.

In failing to perform their duty to defend the action in behalf of their wards the guardian *ad litem* of the infant defendants and their testamentary trustee were both guilty of culpable negligence which would have subjected them to liability to their wards if any damage had resulted. A notion, which is entirely erroneous, seems to be prevalent that a guardian *ad litem* for infant defendants fully performs his duty when he files a formal answer, submitting their rights to the protection of the Court. The law is correctly stated in 22 Cyc. 662, as follows:

"The duty of a guardian *ad litem* or next friend is to look after the infant's interest and to act for him in all matters relating to the suit as he might act for himself if he were of

capacity to do. The guardian *ad litem* should make a defense of the interests of the infant as vigorous as the nature of the case will admit. His duty requires him to acquaint himself with the rights, both legal and equitable, of his wards and take all necessary steps to defend and protect them, and to submit to the Court for its consideration and decision every question involving the rights of the infant affected by the suit. If in consequence of the culpable omission or neglect of the guardian *ad litem* the interests of the infant are sacrificed, the guardian may be punished for his neglect, as well as made to respond to the infant for the damage sustained."

The case was referred to the master to take the testimony and report his findings and conclusions. There was testimony that plaintiff had improved the value of the place by putting up new buildings, including a new residence, installing waterworks and electric lights and in repairing old houses, terracing and fertilizing the soil and in other ways. The estimates of the witnesses of the cost of these improvements varied from $12,000 to $22,000. They agreed that the land has advanced considerably in value, without regard to the improvements, as there has been a general advancement in the value of land in the country, and particularly in that section on account of the building of an improved highway through it. The extent of this enhancement varied, according to their estimates, from $10,000 to $15,000.

The master recommended that the prayer of the complaint be granted, that the land be sold, and only $13,150 of the proceeds be burdened with the limitations of the will. The Circuit Court, by decree dated April 19, 1918, confirmed the master's report, and ordered the land sold and conveyed by the master to such purchaser as plaintiff might find, and $13,150 of the proceeds paid to the master to be held subject to the further order of the Court; that the costs and liens be paid out of the excess, and the balance be turned over to plaintiff. By a supplemental decree dated Septem-

ber 18, 1919, plaintiff was given leave to divide the land, under the direction of the master, and sell it in parcels, provided the total of all parcels sold should equal $13,150, and the costs, and from the proceeds the master was directed to withhold $13,150, and pay the balance, after payment of attorneys' fees, costs, and liens, to plaintiff, and after enough had been sold to pay these sums the master was directed to convey any remaining parcels to the plaintiff, or his order.

The contract with defendant for the sale of one of the parcels was dated October 15, 1919. Upon his refusal to comply with it, this action was brought, in which plaintiff's wife joins him, against Schaefer and the other defendants, who are plaintiff's brothers, the children of Osborne, their trustee, and the executors of the will. After alleging the contract and Schaefer's refusal to comply, the complaint reiterates the allegations of the complaint in the first action, refers to the decrees made therein, and prays that they be ratified and confirmed, that the title offered to Schaefer thereunder be adjudged a good title in fee, and he be required to comply with his contract, and that plaintiff be adjudged to be the owner of all the proceeds of the sale of said place, except the sum of $13,150, which is to be held by the master to be distributed according to the will. The answer of the defendants, except Schaefer, admitted the allegations of the complaint and joined in the prayer thereof.

The case was referred to the master, who took the testimony of plaintiff and his attorney, and made his report, recommending that the prayer of the complaint be granted. On exceptions thereto by Schaefer, the Circuit Court confirmed the master's report. The Court based its judgment chiefly upon these grounds: (1) That the Court has the power, having all parties in interest, who are *in esse,* before it, to order the sale of land for the benefit and protection of the estate. (2) That, as there is no obligation on the life tenant to keep the buildings insured, and as there is no guarantee that the land will not depreciate in value in the

future,. it would be for the benefit· of the remaindermen· to sell it and invest the proceeds as a guaranty against future depreciation. And (3) the Court said:

"It seems that· the testator put the plaintiff, ·Alex. Cagle, into possession of the land several years before his death, and that the improvements and· repairs were begun by the plaintiff in the lifetime of the testator. Therefore the testator knew that the plaintiff was treating the land as his own. With this knowledge in his mind, the testator·by· his will; placed a certain specific. valuation upon; the tract of land in question, and also specifically empowered his executors tó sell said land for reinvestment. It follows, there-·fore, from these circumstances that·there was an equitable conversion, so·that' that which was land became money to the extent of $13,150."

As to soundness of the first proposition stated there is no doubt,. *Bofil v. Fisher,* 3 Rich. Eq. 1, 55 Am. Dec; 627; *Farr v. Gilreath,* 23 S. C. 502; *Rutledge v. Fishburne,* 66 S. C. 155, 44 S. E. 564, 97 Am. St. Rep. 757; *Harris v. Harris,* 86 S. C. 409, 68 S. E. 628; *Dumas v. Carroll,* 99 S. E. 801. · But these and many other cases found in our reports show that this power of the Court is based upon a necessity, which. sometimes arises, that it be exercised to preserve the estate or provide for the bene-·ficiaries thereof. · Therefore the power is not unlimited, as seems to be supposed by some. It is commensurate with, but it is limited by, the necessity which calls for the existence and exercise of it. The necessity need not be absolute. A reasonable necessity is sufficient.

It follows that the exercise of the power must be left to the sound· discretion of the Court. But that does not mean an arbitrary or capricious discretion, or the will or peculiar notion of the particular Judge to whom the application may be made. It must be exercised according to the settled rules and principles of equity upon which it is founded.

"Men will readily accommodate themselves to any certain and well known rule. No one can accommodate himself to those which are locked up in the breast of the Judge until the occasion shall call them forth." Per Chancellor Johnson, in *Thurston v. Dickinson,* 2 Rich. Eq. 317, 46 Am. Dec. 56.

In this case there was no necessity whatever shown for the exercise of the power. There is not a particle of testimony that it was necessary for the protection of the estate, or for the needs of the beneficiaries, or any of them.

4  Therefore, since the power is limited by the reasonable necessity for its exertion for some of the purposes indicated, its exercise was unwarranted by the facts and unauthorized by the law.

In nearly every case in which this Court has affirmed the existence of this power, it has sounded the caution that it must be exercised with great circumspection. In *Harris v. Harris,* the Court said: It "should be exercised with great caution, and after careful investigation by the Court, for in such matters the interests of remaindermen, especially infants, may be readily sacrificed and the Court imposed upon by intentional wrong or negligence of guardians *ad litem* or other persons."

In *Dumas v. Carroll,* we said in effect that, except for the purposes recogniized by law, the Courts have not the power to modify the disposition of property made in wills and deeds, and we cautioned the Circuit Judges to set their face resolutely against the practice, said to be common, of attempting to destroy trusts created by will or deed and interfere with the testator's or grantor's disposition of his property, by consent decrees, especially where the rights of persons *non sui juris* and remaindermen who are only constructively before the Court are affected; otherwise, the *jus disponendi* is of no value. It is regarded as a very sacred right, and so long as it is allowed by law it ought to be so respected and safeguarded by those who are set apart to

administer the law that every one may feel reasonably sure that after he is dead, effect will be given to the provisions which he has lawfully made for the objects of his bounty. In *Mauldin v. Mauldin,* 101 S. C. 1, 85 S. E. 60, a family settlement was agreed upon to obviate litigation between members of the family, some of whom were dissatisfied with some of the provisions of the will, and a consent decree was taken, carrying out the proposed settlement. But this Court reversed the decree, on the ground, among others, that it disturbed the testator's disposition of his property, which cannot be done without cogent reason therefor.

The second ground upon which the decree is based cannot be sustained. While the life tenant may be under no duty to insure the buildings (as to which we decide nothing), it does not follow that the land will depreciate. It may do so, but the testimony points the other way, that it has enhanced and is enhancing in value, and there is not a particle of testimony to the contrary, or upon which a reasonable apprehension of its future depreciation can be predicated. Nor is there any testimony that the sale would be for the benefit of the remaindermen, or, indeed, that it would be for the benefit of the life tenant, except to gratify his desire to unfetter from the limitations of the will so much of the devise as exceeds the valuation put upon it by his father. Clearly he has no right to do that.

Nor can the third ground be sustained. The valuation put upon the land was merely for the purpose of equalizing the donees in the distribution of the estate. It affords no warrant for an inference that the land was given as money, or that it was to be converted into money.

In language too plain to be misunderstood, the testator expressed the opposite intention, to give land and to keep the devise in land, for he authorized a sale or exchange of the land devised only upon the condition that "The proceeds be invested in other real estate with the same limita-

tions, or the property received in exchange be conveyed in like manner."

His meaning is plain beyond any doubt. There was no ground for the application of the doctrine of equitable conversion.

We consider next plaintiff's right to charge the land devised or the remaindermen with the cost of his improvements. The law is well settled that, as a general rule, the life tenant is not entitled to charge the estate or the remaindermen with the cost of his improvements.

7, 8

In *Corbett v. Laurens*, 5 Rich. Eq. 301, a claim for compensation for valuable buildings erected by a life tenant was denied. Wardlaw, Chancellor, speaking for the Court, said: "We are concluded by the course of adjudication in this State from admitting the claim of a tenant for life to be reimbursed for his improvements of the estate."

And, after stating the rule with respect to improvements made by a tenant in common, he said:

"The equity of a tenant for life against remaindermen for the benefit of his improvements is inferior to that of a tenant in common in like case. The tenant for life is exclusively entitled to the enjoyment of the estate for an indefinite term of time, as measured by the calendar, always long in his anticipation; and as to him the inference is more natural that he intends his improvements for his personal use. He is not interested in the inheritance, and has little pretension to anticipate the interests or the wishes of his successors. He is an implied trustee for the remaindermen, and by general rule in equity trustees are not entitled to the profits of their management of the trust estate. His estate is not unfrequently given, rather for the preservation of the rights of the remaindermen than for his own enjoyment. Where a bounty to him is clearly intended, it is commonly no more than the enjoyment of the estate, in the existing condition, at the time of the gift, or in a progressive condition contemplated by the donor at the time of the gift. * * * This.

as a general rule, is not unconscientious; and in cases which may seem to be proper exceptions to its operation, as in a gift for life of wild lands, in such terms as clearly import an intended bounty to the tenant for life, which cannot be enjoyed in the existing condition of the subject, the tenant may obtain, by timely application to this Court, either a sale of the whole estate, so that he may enjoy the income, or authority to make improvements permanently beneficial; and he suffers from his own wilfulness, if he proceed upon his own notions of improvement, without asking aid or advice. The Court may sanction what it would have previously authorized, but it encourages no experiments upon its power of retroactive relief."

In *Trimmier v. Darden,* 61 S. C. 220, 235, 39 S. E. 373, 378, after quoting the above excerpt from the opinion in *Corbett v. Laurens,* the present Chief Justice added:

"The general rule, firmly established in this State, is that a tenant for life, who puts improvements on land, is not entitled to compensation from the remaindermen. The right of a tenant for life to compensation for improvements on the land is even inferior to that of a tenant in common in like case who is not allowed the exclusive benefit of his improvements, except 'under circumstances which would make it a great and obvious hardship to be deprived of the benefit of such improvements.' *Buck v. Martin,* 21 S. C. 590, 53 Am. Rep. 702, and cases therein cited."

According to our decisions, there are some exceptions to the general rule above stated, based upon peculiar and exceptional circumstances; but the circumstances of this case do not take it out of this rule. The chief ground upon which the plaintiff bases his claim is that his father put him in possession of the place some five or six years before his death, with the understanding that his father would give it to him, and, in reliance upon his understanding, he spent his money in improvements, during his father's lifetime and with his knowledge. There is no testimony that his father told him

that he would give him an absolute estate, or that he was misled by anything that his father said or did as to the kind of estate he intended to give him. The circumstances were sufficient to warrant plaintiff in believing that his father would give him the place, but they were not sufficient to justify his inference that he would get an absolute title to it. He said his father furnished the money to make the improvements, and that the cash charged against him in the will, as having been advanced, was spent on the place. But, according to his own testimony, more than three-fourths of the money spent in improvements was spent after his father's death, when he knew that he had only a life estate. While he knew that he was improving property that would ultimately go to others, he knew also from the terms of the will that he and his wife would enjoy the benefit thereof during their lives, and, after them, his issue, if he should leave any. But he says he has been married for 11 years and is without issue. Neither the hope nor possibility of issue is extinct. The wife may yet have issue or she may die, and he may marry again and have issue, for he is a young man, being less than 45 years of age. But, be that as it may, he is presumed to have known the law, which denies a life tenant the right to improve remaindermen "out of their estate," which he could easily do by allowing him to deduct the cost of his improvements from the proceeds of each sale or exchange that he is authorized to make in the ninth paragraph of the will. It is unnecessary to decide what plaintiff would have been entitled to deduct for his improvements, if he had brought himself within the rule. But lest our silence be taken as approval of what was allowed, we may say that he would not have been entitled to the cost of his improvements, but only to so much as they had added in actual and permanent value to the property. *Ex parte Palmer,* 2 Hill's Eq. 216. Nor would he have been entitled to the natural increase in the value of the property.

The decrees herein referred to are vacated as having been made without authority of law.

Judgment reversed.