12498

GUIGNARD *ET AL.* v. CORLEY *ET AL.*

(144 S. E., 586)

April, 1927.

*Messrs. Lyles & Lyles,* for appellant,

*Messrs. James S. Verner,* and *D. W. Robinson,* for respondents,

September 20, 1928.

The opinion of the Court was delivered by Mr. Justice Cothran.

This is an action for partition, instituted by the plaintiffs as the personal representatives of G. A. Guignard, deceased, under his will, against 29 defendants, alleged to be tenants in common with G. A. Guignard, of certain real estate situated in and near the Town of Cayce, in Lexington County. The principal defendant in the issues now presented is the Cayce Land Company, between which company and G. A. Guignard there has heretofore been much litigation. See 124 S. C., 443; 117 S. E., 644; 131 S. C., 296; 127 S. E., 364; 135 S. C., 446; 134 S. E., 1; and 140 S. C., 497; 139 S. E., 145.

It appears that all points of controversy between the Guignard estate and the Cayce Land Company, and all points affecting the codefendants of the Cayce Land Company, have been settled by the previous decisions of this Court above referred to, and by the decree of his Honor, Judge Grimball, in the present action, except the respective contentions of the Guignard estate and the Cayce Land Company in regard to the two railroad tracks that have been laid by Guignard over parts of the property admittedly subject to partition. Upon the plat, reproduced at page 521 of the case of *Cayce Land Co. v. Guignard,* 135 S. C., 446; 134 S. E., 1, these two tracks are designated, respectively as "Guignard siding connecting with Southern Ry.," and "Guignard R. R." For convenience and to prevent confusion, they will be referred to as the Southern spur track and Seaboard spur track, for they are both *spur* tracks rather than *side* tracks.

The Southern spur track was constructed by Guignard at his own expense in 1909 under a license agreement with the Southern Railway Company, in order to secure a connecting line from his brickyard on the north side of the Southern Railway, to that railroad. It led from a switch, giving a physical connection with the railroad across the

railway company's right of way, and across a certain strip of land lying between the northern limit of the right of way and the line of the Moseley estate and other land belonging to Guignard, on to the brickyard. This strip of land has been designated as the "segment," for the reason that it lies between the north line of the railway company's right of way, which is on a curve, as the "arc" of a theoretical circle, and the property line of the Moseley estate and of Guignard as the "chord"; it is about 900 feet long, and about 30 feet wide at the widest point, containing four-tenths of an acre. The track extends for about 50 feet over and across this segment.

It has been decided by this Court, on the appeal reported in 135 S. C., 446; 134 S. E., 1, that the railway company was within its rights in granting to Guignard a license of a right of way, over its right of way, between the switch connection and the north line of its right of way, that such license did not constitute an additional servitude, but that, so far as the construction of the track over the segment was concerned, Guignard was a trespasser *ab initio*. It was said:

"Guignard was mistaken in the extent of land covered by his contract with B. B. Cayce, and as to this strip he was a trespasser upon land which belonged, after the termination of the fee defeasible, to the executory devisees and their successors in title."

In other words, it appeared from the Tomlinson survey that, even if B. B. Cayce had formally executed a deed to Guignard covering the fee to the 3½ acres included in the railway company's right of way, the segment was not included within it, and that as to it he had never had even color of title. He was required to, and did account for the rental value of that part of the segment occupied by him.

The Seaboard spur track was constructed by Guignard, in 1909, under a contract with the receivers of the Seaboard Air Line Railway Company, and under a license of the

Southern Railway Company, to obtain a way by which he could haul by rail clay from a pit on the south side of both railroad main lines, to his brickyard on the north side, and also by which he could haul brick and other freight to and from the brickyard and the Seaboard's station at Cayce. It led from the track of the Seaboard, south of the Southern's track, crossing the right of way of the Southern by an underpass, constructed by license of the Southern, crossing the segment hereinbefore referred to, and proceeding over land of Guignard, to the brickyard. The track extends about 10 feet over and across the segment.

It has been decided by this Court in the appeal reported in 135 S. C., 446; 134 S. E., 1, that the Southern had no right to grant a license to Guignard for the construction of this spur track over its right of way, that it constituted an additional servitude, for the occupation of which by Guignard he was accountable, and that, so far as its construction over the segment was concerned, Guignard was a trespasser *ab initio,* as in the case of the Southern spur track. He was required to, and did, account for the rental value of that part of the track upon both the right of way and the segment occupied by him.

This appeal concerns the respective rights of the Guignard estate and the Cayce Land Company to the strip of land covered by the Southern spur track, over and across the segment, and the strip of land covered by the Seaboard spur track, over and across the right of way of the Southern Railway Company, and over and across the segment.

The special Referee, to whom the matter was referred, filed an interesting and elaborate report. Upon the questions at issue upon this appeal, he recommended that, as the area covered by the two spur tracks was less than the distributive share of the Guignard estate, as a tenant in common of the 135 acres subject to partition, the strips of land occupied by the two spur tracks be allotted to the Guignard estate, upon condition that, in consideration of the improve-

ments thereon, they pay to the Cayce Land Company the sum of $6,978 for equality of partition. He arrived at this figure by estimating the cost and value of the improvements at $7,050, and the interest of the Cayce Land Company therein, at 215/216 of $7,050—$6,978 ($7,017.37?)

Upon exceptions to the Referee's report, his Honor sustained the report as to the allotment of the strips to the Guignards, but reversed it as to the payment of the assessment for equality of partition, sustaining the contention of the Guignards that they were entitled to the allotment without the assessment, and overruling the contention of the Cayce Land Company that the assessment should have been greater. The land company made an offer of $20,000 for the strips, and insisted that they should be put up for sale at that initial bid.

From the decree, the Cayce Land Company has appealed upon exceptions which fairly present the questions hereinafter discussed.

It is important to observe that, at the time Guignard constructed the two spur tracks, he had no title to either the 3½ acres included within the right of way of the Southern Railway Company, or to the four-tenths of an acre outside of the right of way, the segment, upon both of which both spur tracks were constructed.

At that time the title to the 3½ acres was in B. B. Cayce, as successor in title of John Campbell Bryce; but that title was a fee defeasible in John Campbell Bryce, with a limitation over, upon his death, to his six sisters, as executory devisees under the will of John Campbell Bryce's grandfather, John Bryce.

It appears that B. B. Cayce contracted to sell the fee in the 3½ acres covered by the Southern's right of way to Guignard, but never executed a deed therefor. Guignard, however, went into possession of it, with the exception of the roadbed of the Southern, and built three small houses upon it. Thereafter the fee defeasible of B. B. Cayce, as

successor in title of John Campbell Bryce, fell in, upon the death of the latter in March, 1915, without issue, at which time the executory devise in favor of the six sisters of John Campbell Bryce took effect; so that, even if Guignard had taken a deed from B. B. Cayce in 1909, his interest under it would have failed upon the death of John Campbell Bryce in 1915, and the consequent vesting of the title in the six sisters.

Prior to 1909, in 1906 or 1907, as explained in 124 S. C., at page 454; 117 S. E., 644, Cayce Land Company had acquired the interests of five of the six executory devisees; the interest of one of them, Margaret C. Simmons, was not then acquired.

After Guignard had gone into possession of the 3½-acre strip under his contract with B. B. Cayce, the Southern Railway Company brought an action *against him and B. B. Cayce* to establish its right of way. The action resulted in a decree requiring a conveyance *by the defendants* to the railway company of a strip 65 feet on each side of the track, between the Congaree River and the State road—the 3½-acre strip referred to.

But in 1916, after the fee defeasible of John Campbell Bryce had terminated by his death without issue in March, 1915, the Cayce Land Company, which as stated had acquired the interests of five of the six executory devisees, and the heirs of Margaret C. Simmons, the sixth sister, whose interest had not been acquired by the Cayce Land Company brought an action against the Southern Railway Company to recover possession of the strip of. 3½ acres, upon the ground that whatever rights the railway had were derived from the fee defeasible estate of John Campbell Bryce, which had terminated in 1915. This suit resulted in a judgment in favor of the plaintiffs for compensation for the right of way, which was paid by the railway company. The effect of this judgment was to establish the fee to the strip in the Cayce Land Company, which owned the interests of

five of the six executory devisees, and in the heirs of Margaret C. Simmons, the sixth devisee, and to establish the easement of right of way in the railway company.

Thus the interest of Guignard in the fee to the 3½ acres was completely annihilated both by the falling in of the fee defeasible estate, and by the judgment of the Court. All the interest which he ever had outside of his contract with B. B. Cayce was the right of way over the Southern's right of way acquired by the license agreement with that company in 1909, which has been confirmed by the decision of this Court in 135 S. C., 446; 134 S. E., 1.

The interest of Guignard in the segment was even more remote than in the 3½-acre strip. While he was in possession, under his oral agreement with B. B. Cayce, of the 3½-acre strip, subject to the railway company's right of way, he evidently assumed that the area covered by that agreement extended beyond the north right of way line to the line of the Moseley land and of his own other land. It appears to have been considered as a possibility by his Honor, Judge Moore, who in his decree, dated March 16, 1922 (see 124 S. C., 443; 117 S. E., 644), held that Guignard was in possession of the segment as trustee of the executory devisees, and was bound to make a full disclosure of the amount of land so possessed; that there was no evidence before the Court to establish where the line was which divided the strip from the other lands of Guignard. He therefore ordered Guignard to appear before the special Referee "and make a complete and perfect showing as to what lands are now or have been in his possession which constituted a part of the original Bryce tract of land lying north of the right of way of the Southern Railway Company and that the said R. E. Carwile, Special Referee, be authorized and directed to have a survey made thereof with a plat thereof." He also decreed:

"That the defendant, Guignard, * * * account for the rental value of the said lands occupied by him, since the

death of the tenant in fee defeasible, John Campbell Bryce, which occurred in the year 1915."

From this decree Guignard appealed; it was affirmed by this Court in 124 S. C., 443; 117 S. E., 644, May 22, 1923.

On October 18, 1923, the Referee had the survey made. It developed that there was a strip outside of the right of way, between its north line and the line of the lands of Moseley and Guignard, containing four-tenths of an acre, hereinbefore referred to as the segment.

It was then discovered that the supposition that Guignard had acquired the interest of Margaret Simmons, the sixth sister of John Campbell Bryce, was a mistake; that she had not been settled with, and that her children, twelve in number, had succeeded to her interest, she having died before the death of John Campbell Bryce, the tenant in fee defeasible.

The Cayce Land Company then acquired the interest of eleven of the twelve children of Margaret Simmons, omitting to acquire the interest of Mary Tucker, the twelfth child, who had survived her mother, but had since died childless, leaving her husband, W. H. Tucker, as one of her heirs at law, entitled to her interest of 1/216 (see 135 S. C., top of page 548; 134 S. E., 1) ; the remaining interest of Mary Tucker being inherited by the five sisters of Margaret Simmons, and conveyed by their deed to Cayce Land Company.

The Cayce Land Company then, unmindful of the outstanding interest of 1/216 in W. H. Tucker, applied upon notice, to Judge Rice, for an order confirming its title to the segment, and obtained an order dated March 3 or 4, 1924, providing:

"That the title of the plaintiff [Cayce Land Company] to the lot of land on the north side of the right of way of the Southern Railway as shown upon the plat thereof made by the Tomlinson Engineering Company, and certified to by R. E. Carwile, Esq., Special Referee in said cause, and

hereto attached to be recorded herewith, be and the same is hereby, ratified and confirmed, and the defendant, G. A. Guignard, is hereby adjudged to surrender possession thereof to the plaintiff."

A few weeks after the order of Judge Rice, dated March 3 or 4, 1924, to wit, on April 17, 1924, Guignard, ascertaining that the Cayce Land Company had not acquired the 1/216 interest of W. H. Tucker, procured a conveyance from him of that interest, and thereby defeated the efforts of the Cayce Land Company to enforce the order of Judge Rice confirming the title of the Cayce Land Company in the segment, it being held by his Honor, Judge DeVore, in subsequent proceedings to oust Guignard, that, by his purchase of the Tucker interest, Guignard had become a tenant in common with the Cayce Land Company in the segment. See 135 S. C., 446; 134 S. E., 1, where Judge DeVore's order was affirmed.

So much perhaps tedious detail appears necessary to a clear apprehension of the status of Guignard with reference to the strips occupied by the two spur tracks, at the time of the erection by him of the improvements in question, which may be concretely stated thus:

*As to the Southern spur track:* He was rightfully entitled to a right of way upon the right of way of the Southern Railway Company, under license from that company, as has heretofore been decided by this Court; he was a trespasser upon the segment.

*As to the Seaboard spur track:* He went into possession of that portion of the strip upon which the track was constructed within the limits of the right of way of the Southern Railway Company, under some kind of an indefinitely stated contract with B. B. Cayce. The latter held under the fee defeasible estate in John Campbell Bryce, and assuming that, as between Guignard and B. B. Cayce, part performance of the contract by Guignard would have justified an enforcement of this contract, Guignard would have acquired

only the interest which B. B. Cayce possessed, which would have placed him in the same position which B. B. Cayce occupied, namely, as trustee for the executory devisees; otherwise, as to this portion of the spur track, he would occupy the position of a trespasser. He went into possession of the segment without a trace of claim or title, and as to it he was clearly a trespasser.

It was decided in the appeal in 135 S. C., 446; 134 S. E., 1, that John Campbell Bryce and those who held under him as the tenants of a fee defeasible were trustees for the executory devisees and were not entitled to be reimbursed for improvements made upon the property so held by them. In the decree of Judge Moore, affirmed in 124 S. C., 443; 117 S. E., 644, it was held that those who claimed under John Campbell Bryce "were only life tenants of the property and trustees to protect the remaindermen against any adverse claim. They were therefore not in position to assert a claim within themselves based upon improvements made to the property. In the case of *Trimmier v. Darden*, 61 S. C. [220, 39 S. E., 373], the rule recognized and said to be firmly established [is] that a tenant for life who puts improvements on land is not entitled to compensation from the remaindermen. The case is much stronger where the tenant for life is not only such tenant but is a trustee to protect the rights of the remaindermen."

In 135 S. C., 446, at page 553; 134 S. E., 1, 35, the Court said:

"We doubt very much if Guignard, who took possession of this strip under a contract with B. B. Cayce, covering the $3\frac{1}{2}$ acres of land constituting the right of way of the Southern Railway Company, the strip being outside of that right of way, can be so connected with one who held under the tenant in fee defeasible as to constitute him a trustee for the executory devisees and their successors in title. This situation had not developed when Judge Moore's decree was signed, and there is nothing to show that he meant to hold

that one in possession under these circumstances was a trustee for the executory devisees. Guignard was mistaken in the extent of land covered by his contract with B. B. Cayce, and as to this strip he was a trespasser upon land which belonged after the termination of the fee defeasible, to the executory devisees and their successors in title."

It is clear therefore that, so far as the segment is concerned, Guignard was not even a trustee for the remaindermen or executory devisees, and that, if he could have been so considered, he still would not have been entitled to credit for his disbursements, or, what amounts to the same thing, to invoke the remedy, sometimes under strictly equitable considerations, awarded to an improving tenant in common, of having his distributive interest allocated upon the improved portion of the estate.

The rule as to improvements by a *life tenant* is strictly enforced against his claim for reimbursement. The Court says, in *Trimmier v. Darden,* 61 S. C., 220, at page 235; 39 S. E., 373, 378:

"The general rule, firmly established in this State is, that a tenant for life who puts improvements on land is not entitled to compensation from the remaindermen. The right of a tenant for life to compensation for improvements on the land is even inferior to that of a tenant in common in like case who is not allowed the exclusive benefit of his improvements, except 'under circumstances which would make it a great and obvious hardship to be deprived of the benefit of such improvements.' *Buck v. Martin,* 21 S. C., 590 [53 Am. Rep., 702] and cases therein cited."

See, also, *Corbett v. Laurens,* 5 Rich. Eq., 301.

The rule as to compensation for improvements put upon the common estate by *a tenant in common* is much more favorable to the tenant in common than to trustees or life tenants, and yet it is not without its limitations; the tenant in common must present considerations which would demonstrate the inequity of casting the entire

loss upon him by forcing the enhanced value of the property into the general estate for general distribution. See extended note to 1 A. L. R., 1189, citing *Williman v. Holmes,* 4 Rich. Eq., 475. *Scaife v. Thomson,* 15 S. C., 337. *Annely v. DeSaussure,* 17 S. C., 389. *Buck v. Martin,* 21 S. C., 590; 53 Am. Rep., 702. *Johnson v. Pelot,* 24 S. C., 255; 58 Am. Rep., 253. *Sutton v. Sutton,* 26 S. C., 33; 1 S. E., 19. *Hall v. Boatwright,* 58 S. C., 544; 36 S. E., 1001; 79 Am. St. Rep., 864. *Tedder v. Tedder,* 109 S. C., 451; 96 S. E., 157. *Young v. Edwards,* 33 S. C., 404; 11 S. E., 1066; 10 L. R. A., 55; 26 Am. St. Rep., 689. See, also, *Youmans v. Youmans,* 128 S. C., 31; 121 S. E., 674. *Cain v. Cain,* 53 S. C., 350; 31 S. E., 278; 69 Am. St. Rep., 863. *Charleston, C. & C. R. Co. v. Leech,* 35 S. C., 146; 14 S. E., 730. *Shumate v. Harbin,* 35 S. C., 521; 15 S. E., 270. *Trimmier v. Darden,* 61 S. C., 220; 39 S. E., 373. *Vaughan v. Langford,* 81 S. C., 282; 62 S. E., 316; 128 Am. St. Rep., 912; 16 Ann. Cas., 91. *Cagle v. Schaefer,* 115 S. C., 35; 104 S. E., 321.

Guignard was further removed from relief than either a trustee, a life tenant, or a tenant in common; and even if he had been a tenant in common at the time he made the improvements, we cannot see the slightest equity upon which he could rely to justify the indulgence sometimes granted to one of that class. He could not have believed that he had a good title to any of the property, for it is conceded that he went into possession under an oral contract with B. B. Cayce, who held only the defeasible fee of John Campbell Bryce.

It has been held in the following cases that an improving tenant in common must have had reason to believe, and must have honestly believed, that he had the fee simple title in severalty to the land improved, in order to obtain compensation for his improvements on partition: *Williman v. Holmes,* 4 Rich. Eq., 475. *Scaife v. Thomson,* 15 S. C., 337. *Annely v. DeSaussure,* 17 S. C., 389. *Johnson v.*

*Harrelson,* 18 S. C., 604. *Buck v. Martin,* 21 S. C., 590; 53 Am. Rep., 702. *Johnson v. Pelot,* 24 S. C., 255; 58 Am. Rep., 253.

We think, however, that, notwithstanding the absence of such belief, there may have existed other controlling equitable considerations which would have entitled him to compensation. See note 1 A. L. R. at page 1199.

The Guignards insist, however, that they are entitled to have the conveyance of Tucker's interest, dated in 1924, 15 years after Guignard constructed the improvements, relate back to the date of the improvements, 1909, and Guignard's rights considered as if he had procured that conveyance before he made the improvements. We do not think so.

The proposition seems fair and just that, if improvements are made, not by the original tenant in common, but by his grantee, there is no good reason why the latter should not have the same measure of protection which a Court of equity would have afforded to his grantor if no conveyance had been made. See cases cited in 1 A. L. R. at page 1199.

But this is quite different from the proposition that a trespasser may enter upon the common estate, make improvements, and then, when he scents the danger of losing his improvements, purchases the interest of a tenant in common and attempts to sail under his flag. The situation was crystallized when he entered without right and erected the improvements. At that instant the improvements passed to all of the tenants in common, and a conveyance by one tenant in common conveyed only his interest in the general estate augmented by the unwarranted improvements. His deed from Tucker could convey no greater right or interest than Tucker possessed, and certainly Tucker could not have claimed the interest of all of the other tenants in common in the improvements which then had become the common property of all.

The result of the Circuit decree is to give the Guignard estate the full benefit of all improvements placed upon the strips in question, when he was neither a trustee, a life tenant, or a tenant in common, in each of which relations, as we have seen, the right is not absolute by any means, but hedged with difficult limitations; and yet there has been accorded to a trespasser, without limitation, an indulgence which would be denied to those who occupy greatly more favorable relations.

The logical result of the foregoing conclusions would be to deny to the Guignard estate all compensation for the cost and value of the improvements placed upon the strips occupied by the spur tracks; but it does not necessarily follow that the Court would not have the power to allot these particular strips to the estate, under all the circumstances, requiring the estate to pay to the Cayce Land Company 215/216 of such cost and value.

The situation is peculiar, and strongly appeals to the Court to exercise its great chancery powers to order what is equitable and just. The Guignard estate, through his efforts, have a valuable and extensive industry; the spur tracks are the life-blood arteries of that industry; they are of practically no use to any one else; and the disposition of the Cayce Land Company to exercise an absolutely destructive power against that industry by a throttle hold upon it does not commend it to the favorable consideration of the Court. It could offer $50,000 for the strips as easily as $20,000, for it must know that they are indispensable to the industry. By purchasing at $50,000, the land company would be required to contribute only $203 upon its bid, and hold the strips and spur tracks against the estate for such an amount as their conscience would permit. Equity will not countenance such a stranglehold. If the spur tracks are not indispensable to the industry and they could be duplicated elsewhere, the present spur tracks would be utterly useless to the land company.

,We think that the special Referee has attained the justice of the case, and that his recommendation that the strips and spur tracks be alloted to the Guignard estate upon the condition stated should have been adopted by the Circuit decree.

The judgment of this Court is that the Circuit decree be modified as hereinbefore indicated and that the case be remanded to that Court for further proceedings consistent herewith.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.