12863

BANK OF SWANSEA v. RUCKER *ET AL.*

(152 S. E., 712)

*Messrs. Efird & Carroll,* for appellant,

*Messrs. Timmerman & Graham,* for respondents,

March 21, 1930.

The opinion of the Court was delivered by Mr. Justice Cothran.

This action was originally instituted in 1925 for the purpose of foreclosing two mortgages which had been executed by the defendant Anna Rucker to the bank; the one dated in 1919, to secure a note of the same date for $2,128.50, covering her undivided interest in a tract of 500 acres, and also her undivided interest in an unimproved lot in the Town of Swansea; the other dated in 1922 to secure a note of the same date for $801.26, covering a tract of 55 acres.

The mortgagor Anna Rucker was the wife of M. J. Rucker, who died in 1916, leaving as his heirs at law the widow and two daughters, Mae, who married William Hutto, and Lillian, who married P. L. Lybrand. Mrs. Hutto

and Mrs. Lybrand were made parties defendant to the fore-closure suit, as claiming some interest in the property.

The suit proceeded to judgment against Mrs. Rucker for $3,210.62 and $1,131.15, the amounts due upon the notes referred to, and a decree of foreclosure and sale was signed December 12, 1925. We apprehend, for the reason herein-after explained, the decree of foreclosure directed the sale of the 55-acre tract as the property of Mrs. Rucker and the *undivided interest of* Mrs. Rucker in the Swansea lot; *it did not direct the sale of the undivided interest of Mrs. Rucker in the 500-acre tract.*

The 55-acre tract and the undivided interest (so-called), of Mrs. Rucker in the Swansea lot were bid off by the bank, and deeds therefor properly executed.

Recurring to certain events that had in the meantime transpired: The intestate, M. J. Rucker, died seized and possessed of three parcels of real estate—a tract of 500 acres, the home place, a tract of 55 acres, and the vacant lot in the Town of Swansea. He was then living with his family upon the 55-acre tract. Shortly after his death the family moved into the Town of Swansea and occupied a rented house. It was agreed by the widow and the two daughters, who were entitled to a third each as heirs at law, that three men be selected to appraise and divide the real estate among them. Witt, the president of the bank, and two others, Haigler and Rast, were selected as appraisers. They had the assistance of one Rister, who appears to have been familiar with the lines. They went upon the lands, and ran a divid-ing line through the 500-acre tract, allotting one part of it, 219 acres to Mrs. Lybrand and 248 acres to Mrs. Hutto (an apparent shortage of 33 acres), and the 55-acre tract to Mrs. Rucker. Witt and Haigler, two of the appraisers (Rast having died in the meantime), and Rister, who was assisting in the appraisement and allotment, testified that it was the understanding that the girls should be alloted the 500-acre tract and Mrs. Rucker the 55-acre tract *and the*

*Swansea lot.* There is some controversy as to the allotment of the Swansea lot to Mrs. Rucker, and, as the counsel for the bank do not appear to insist upon this very plausible explanation of the allotments, we will give it no further attention.

Later in 1923 deeds were interchanged confirming the allotments above referred to, but they did not include or refer to the Swansea lot.

After the family had moved from the home tract of 55 acres into the Town of Swansea, Mrs. Rucker borrowed from the bank in 1919 the money represented by the first and larger mortgage, some $2,000, for the purpose of erecting a residence upon the Swansea lot. It was understood by the bank that that was the purpose of the loan which was secured, as stated, by a mortgage covering her undivided interest in the 500-acre tract and her "undivided interest" in the Swansea lot. Mrs. Rucker let the building contract to one Moore, who furnished all of the material, completed the house, and turned it over to her. It has been suggested that the timber for the house came from land owned by the three joint tenants; this theory is inconsistent with the testimony of the contractor, and, if true, is susceptible of the inference that it came from the 55-acre tract which had been alloted to Mrs. Rucker. Later in 1922 she borrowed from the bank about $800 secured by a mortgage upon the 55-acre tract.

After the foreclosure sale, when the bank had bid off the 55-acre tract and the "undivided interest" of Mrs. Rucker in the Swansea lot, the bank endeavored to get possession of the Swansea lot upon which Mrs. Rucker had built the residence, but was met with the claim of Mrs. Hutto and Mrs. Lybrand that they were entitled to a third each of the Swansea lot, including the house which had been built by their cotenant, Mrs. Rucker.

Accordingly, a consent order was passed by the Court on February 8, 1927, setting aside so much of the decree of foreclosure as purported to adjudicate the rights of Mrs.

Hutto and Mrs. Lybrand in the Swansea lot, and allowing them to set up their claims to a third interest each therein; this they did by answer. The substance of their contention is that the Swansea lot was not included in the parol partition, and that their interests in it have not been affected by the sale under foreclosure, and that they are entitled to a third each of the entire lot, including the house and improvements placed thereon by Mrs. Rucker; that a division in kind cannot be had, and that the premises should be sold as a whole and the proceeds divided among them and the bank, which had acquired the interest of Mrs. Rucker.

The original action was thus transmuted, so far as the Swansea lot is concerned, into an action for partition among the parties other than Mrs. Rucker, and the real point at issue is whether the bank, succeeding to the rights of Mrs. Rucker, has the right to have the portion of the lot which was improved by her allotted to it, which would give it the benefit of the improvements.

By consent a reference was had and testimony taken. When the case came on for hearing before his Honor, Judge Featherstone, in December, 1928, he signed an order dated January 4, 1929, in which he did not pass upon any of the legal questions involved, but directed simply that a writ in partition be issued, reserving all questions of rights and equities for further determination upon the coming in of the return of the commissioners in partition.

The commissioners made return, dividing the lot into three parts allotting one to each of the tenants in common.

The matter then came on to be heard by his Honor, Judge Townsend, who filed a decree dated March 23 (1929?), in which he held that the improvements inured to the benefit of all the cotenants. He directed that the lot be sold as a whole, and that the proceeds of the sale be applied, first to the payment of the costs and expenses incident to the proceedings in partition and sale, and that the remainder be equally divided between the plaintiff bank and the defendants Mrs. Hutto

and Mrs. Lybrand, one-third to each. From this decree the plaintiff bank has appealed to this Court.

While the evidence is not clear as to the amount of the borrowed money applied by Mrs. Rucker to the construction of the improvements, it is evident that the greater part of it was so applied; and whether all or a part was so applied is a matter that could not affect the question at issue, for, whatever improvements were placed upon the lot, they were placed there by Mrs. Rucker; there is not the slightest evidence that a dollar that went into them was furnished by either of the daughters, or that any part ·of the common property was appropriated thereto.

The right of the bank to have that portion of the lot improved allotted to it must be worked out, if at all, through the right of Mrs. Rucker to which the bank has succeeded; in other words, if there had been no mortgage and no foreclosure, would Mrs. Rucker have had the right, in the partition of the Swansea lot, to have that portion of it improved by her allotted to her?

Before entering upon a discussion of this issue, it is worthy of observation that the bank's mortgage covered not only the "undivided interest" of Mrs. Rucker in the Swansea lot, but her "undivided interest" in the 500-acre tract, *and that the decree of foreclosure did not contain a direction that it be sold.* Her interest was one-third, or practically 160 acres, which could have been embraced in the order of sale. This was a distinct benefit to the daughters to whom the 500-acre tract had been allotted at a time when the mortgage covered the interest of the mother which the daughters acquired. This omission was evidently due to the impression of the bank that the oral partition had had the effect of transferring its mortgages to the 55-acre tract and the Swansea lot as the individual property of Mrs. Rucker. If it has not had that effect, it is possible that the bank may yet go upon the undivided interest of Mrs. Rucker in the 500-acre tract. This suggestion is made simply to demonstrate

that, under all the circumstances of the case, the daughters will suffer no prejudice by the Court's sustaining the present contention of the bank that the portion improved by Mrs. Rucker be allotted to it; whereas, if it had been insisted upon, there is good ground for holding that the entire lot had been allotted to Mrs. Rucker. It will be seen from the authorities to be cited that the right thus claimed for the improving tenant in common will not be allowed where it would prejudice the interests of the other cotenants.

The rule appears well settled in this State that the right of a cotenant in possession of the common property to be reimbursed for improvements made by him, or in the partition to have the portion of the land improved by him allotted to him, is exceptional, and to maintain it the improving tenant must establish: (1) That he was in possession under an honest belief of ownership; or (2) that to disallow his claim would be inequitable; and (3) that the allowance would result in no inequity to the interests of his cotenants.

Among the earlier cases the rule was announced with rigidity that the claim could not be allowed unless the improving tenant had reason to believe, and honestly believed, that he had the fee-simple title in severalty to the land improved. *Williman v. Holmes,* 4 Rich. Eq., 475; *Scaife v. Thomson,* 15 S. C., 337; *Annely v. De Saussure,* 17 S. C., 389; *Johnson v. Harrison,* 18 S. C., 604.

The rigidity was greatly modified by the cases of *Buck v. Martin,* 21 S. C., 590, 53 Am. Rep., 702; *Johnson v. Pelot,* 24 S. C., 255, 58 Am. Rep., 253; *Sutton v. Sutton,* 26 S. C., 33, 1 S. E., 19, 23; *Shumate v. Harbin,* 35 S. C., 521, 15 S. E., 270; and *Guignard v. Corley,* 147 S. C., 12, 144 S. E., 586, 62 A. L. R., 533, which declare the essentials above stated.

In the case of *Buck v. Martin, supra,* the mother of a family of children who were cotenants with her of a tract of land erected a house upon the common property into which the family moved and were reared. She knew, of

course, that she did not have title to the property, and made no claim that she thought that she did. One of the children conveyed her interest to a creditor; a creditor of this grantee recovered a judgment against him, issued execution, and levied upon and sold the interest of the daughter. The purchaser then brought an action for partition, and the mother claimed the value of the improvements made by her. The Court in an exceedingly human opinion sustained her contention.

The Court, referring to the case of *Johnson v. Harrelson, supra,* said:

"In this last case the principle is announced by the Chief Justice as follows: 'As a general rule, and in ordinary cases, where the cotenants are all known and easy of access, and one moves forward without consultation with the others, and erects improvements of his own accord whether desired or not by the others, he does so at his own risk, and such improvements will not be allowed. * * * Where, however, improvements have been erected by a co-tenant, which add value to the common estate, and erected under circumstances which would make it a great and obvious hardship upon the improving tenant to deprive him entirely of the benefit of such improvements, throwing their whole value into the common estate for partition, the disposition of the Court of equity has always been to give the improving tenant the benefit thereof as far as consistent with the equity of his co-tenants. 1 Story Eq. Jur., § 655.' It seems to us that the improvements in this case were erected by the mother and her husband, 'under circumstances which would make it a great and obvious hardship upon them to be deprived of the benefit of such improvements, throwing their whole value into the common estate.' "

To further sustain the mother's claim it was said:

"We do not regard the rule that the improving co-tenant is not entitled to compensation, as applying to the case where all the *co-tenants concur* in the improvements. From

the peculiar circumstances of this case, we must regard it as belonging to that class of cases. It is true that the children *were minors* at the time the improvements were made and could not consent for themselves, but they were with their mother, and the family needed a home—indeed, it was absolutely necessary. If, at the time, an application had been made to the Court for leave to build a little cottage on the common property as a shelter for the family, can there be a doubt that such application would have been granted by the Court, acting for the children? *Ex parte Palmer,* 2 Hill Eq., 218; *Corbett v. Laurens,* 5 Rich. Eq., 316. Then we regard that done which should have been done. It was not the legal duty of the mother or her husband to support the children without the use of their shares. The possession of the mother was also the possession of the children living with her, and of course they have no just claim for rents and profits which they consumed themselves. The plaintiffs have no higher rights than Mrs. Dantzler transferred to Miller & Richey. We think the facts require us to consider the improvements as made with the concurrence of all the cotenants, through the Court acting for them."

It will be observed that *Buck v. Martin* was a case in which the improving tenant claimed reimbursement out of the proceeds of the sale; not the right to have the improved portion of the land allotted to her. It is evident that it requires a stronger case to obtain relief of the nature claimed than of the latter. It certainly can work no injustice to the non-improving tenants to allot the improved portion to the improving tenant; it might work great injustice to them to allow a reimbursement in every. case, regardless of the ability or willingness of the cotenants to stand the expense, or to the practical utility of the improvements.

In *Johnson v. Pelot, supra,* the Court said:

"As a general rule, and in ordinary cases, where co-tenants are well known and easy of access, and improvements are made by one without consultation with the others, they are

made at the risk of the improving tenant, and will not, as matter of right, be allowed him in the partition of the premises (citing cases). Where, however, improvements are made by one co-tenant under the belief that he has in severalty a fee simple title to the premises, or where said improvements have been erected under circumstances which would make it a great and obvious hardship upon the improving tenant to deprive him entirely of their benefit, the disposition of the Court of Equity has always been to give him the benefit thereof if practicable, and as far as consistent with the equity of the cotenants, especially as against the claim of one who subsequently thereto establishes his right as co-tenant."

In *Sutton v. Sutton, supra,* the Court said:

"It appears by a number of cases that in this State it is established as a rule that a tenant in common, who, of his own head, improves the common property, is not entitled individually to compensation therefor. This seems to be mainly on the ground that he could at any time have partition, and it is his own folly to improve the lands of others who may dislike the improvements, or object, as some Judge has expressed it, to be 'improved out of their estates.' *Thurston v. Dickinson,* 2 Rich. Eq., 317 [46 Am. Dec., 56]; *Dellet v. Whitner,* Cheves Eq., 223; *Hancock v. Day,* Mc-Mul. Eq., 69 [36 Am. Dec., 293]; *Thompson v. Bostick,* McMul. Eq., 79; *Corbett v. Laurens,* 5 Rich. Eq., 314. But it is certainly unjust that one shall be enriched at the expense and to the injury of another, and there are several well-established exceptions to the rule. As we understand, it does not apply where the co-tenants consent to the improvements, or if they are necessary for the use and enjoyment of all the co-tenants (*Buck v. Martin,* 21 S. C., 592 [53 Am. Rep., 702]), or notably when the improvements are made *bona fide,* under an honest conviction of exclusive ownership of the land. *Scaife v. Thomson,* 15 S. C., 337, 369."

In the most recent case upon the subject, *Guignard v. Corley,* 147 S. C., 12, 144 S. E., 586, 590, 62 A. L. R., 533, the Court said:

"It has been held in the following cases that an improving tenant in common must have had reason to believe, and must have honestly believed, that he had the fee simple title in severalty to the land improved, in order to obtain compensation for his improvements on partition (citing cases).

"We think, however, that, notwithstanding the absence of such belief, there may have existed other controlling equitable considerations which would have entitled him to compensation. See note 1 A. L. R., at page 1199."

In *Ferris v. Montgomery Co.,* 94 Ala., 557, 10 So., 607, 610, 33 Am. St. Rep., 146, the Court said:

"A Court of equity will not allow one man to deprive another of the fruits of his labors, and expenditures if such an unconscionable result may be avoided consistently with the security to each of them of the full measure of all that he is entitled to claim. * * * The co-tenant, whether he supposes himself to be the sole owner, or knows that there are others who are owners in common with him, is entitled to occupy and use the property, though his co-tenants fail or refuse to share with him in the enjoyment thereof; and if, in the course of his use and occupation, he makes improvements on a part of the common property, in good faith, and without any intention of embarrassing or obstructing a partition, or gaining an advantage therein, there is no good reason why he should not be allowed to retain the part improved by him, if his improvements in fact do not constitute a hindrance or obstacle in the way of the other co-tenants getting their full shares on the division of the property. A Court of equity will simply so order the partition as to secure the rights of all parties without visiting an unnecessary hardship upon any of them."

We think that every essential element in establishing the improving tenant's right to have allotted to her the improved

portion of the lot (and by succession the right of the bank) exists in the present case.

Although we are pretermitted by the appellant's failure to present the contention that the entire lot was allotted in the partition to Mrs. Rucker from adopting that view of the evidence, it is reasonably clear that, when she erected the improvements, it was done under the honest belief that the lot was her own under the parol partition; and, even if we cannot sustain her right to the entire lot, it is evident that she so considered it, which would satisfy one of the essential elements referred to. The cashier of the bank so considered the effect of the partition; Witt, one of the appraisers, testified: "Q. Did you appraise any part for Mrs. Rucker? A. The home place 55 acres and a lot in the Town of Swansea." Haigler, another of the appraisers, testified: "We walked over the place and divided it equally as near as we could (referring to the 500-acre tract). We just told where the line should go. The house place (the 55-acre tract), and lot in Swansea was to go to Mrs. Rucker and the rest to the two girls." Rister who accompanied the appraisers as an assistant, testified, referring to Mrs. Rucker: "She told me that they had all agreed for her to take the Home Place and the lot in Swansea and the other tract to be divided between the children."

Another essential element appears in the fact that the improvements were made at the expense of Mrs. Rucker, no part of which being contributed by either of the daughters, and under the circumstances it would be inequitable to throw her money into the common pot.

Another consideration is that the family had moved from the country into town and occupied a rented house; it was, of course, natural and to the advantage of the entire family that the vacant lot be improved as a home for them; and, as was held in the *Buck v. Martin case,* doubtless under the circumstances, if application had been made to the Court, authority would have been given to her to do exactly what

she did, and, as was held in that case, the improvements will be held to have been made with the concurrence of the other co-tenants.

The important consideration is also presented that to allow the claim would not prejudice in the least the interest of the co-tenants; they have not put a dollar into the improvements, and by a partition in kind the allotment of the improved subdivision to Mrs. Rucker and the other two subdivisions to the daughters would give them all that they ever were entitled to, eliminate the mortgage on the 500-acre tract, and protect the very strong equity of Mrs. Rucker, the improving tenant.

We think under the circumstances that it was error on the part of the Circuit Judge in directing that the entire lot be sold as a whole. The return of the commissioners in partition was exactly right, and is the only way in which the respective rights and interests of the parties can be protected.

The judgment of this Court is that the decree of the Circuit Judge be reversed, and that the case be remanded to the Court of Common Pleas for further proceedings consistent with the conclusions herein announced.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE CARTER (dissenting) : I agree with the conclusion reached by his Honor, Judge William H. Townsend, and for the reasons stated in the decree of Judge Townsend think the judgment should be affirmed.